## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United National Insurance Company, a
Pennsylvania insurance company,

                Plaintiff,

vs.

Gunderson, Inc., an Oregon corporation and
Davis-Frost, Inc., a Minnesota corporation,

                Defendants.

Court File No. 08-CV-678 (MJD/JJK)

## DEFENDANT DAVIS-FROST'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF ADDITIONAL DOCUMENTS WHICH COMPRISE THE
RECORD ........................................................................................................... 3

STATEMENT OF ISSUES ................................................................................ 4

STATEMENT OF DISPUTED FACTS ............................................................. 4

FACTUAL BACKGROUND ............................................................................. 5

    I.     DAVIS-FROST'S GENERAL COMMERCIAL LIABILITY
           POLICIES ................................................................................. 5

    II.    DAMAGES TO THE TTX AND PACER INTERNATIONAL
           RAILCARS ................................................................................ 6

    III.   THE TIMING OF THE PAINT FAILURE AND THE RESULTING
           RUST AND CORROSION ....................................................... 8

           A.     BNSF Investigations ......................................................... 9

           B.     Opinion of Davis-Frost's Expert in the Underlying Action .............. 9

           C.     Opinion of Gunderson's Expert ...................................... 10

    VI.   THE UNDERLYING ACTION ............................................. 11

ARGUMENT .................................................................................................... 12

    I.     THE "YOUR PRODUCT" EXCLUSION DOES NOT APPLY TO
           THE PROPERTY DAMAGES TO THE TTX AND PACER
           RAILCARS .............................................................................. 13

           A.     Davis-Frost Has Established Property Damage to the TTX
                and Pacer Railcars ......................................................... 14

            B.     The Damage to the Railcars Was Not "Incidental" to the
                Failure of Davis-Frost's Paint. ...................................... 21

    II.    PROPERTY DAMAGE TO THE RAILCARS OCCURRED
           DURING UNIC'S POLICY PERIODS. .................................. 25

|   | A. | At a Minimum, Whether Property Damage Occurred During UNIC's Policy Periods Is a Genuine Issue of Material Fact. .......... 25 |
|   |   |   |
|   |   | 1. *Under Minnesota law, CGL policies are triggered if they are in effect when "some" property damage occurred.* ........................................................................ 25 |
|   |   | 2. *The evidence demonstrates that property damage occurred during UNIC's policy period.* .............................. 27 |
|   | B. | Defendants Are Not Collaterally Estopped From Presenting Evidence of the Onset of Property Damage or other Coverage-Related Facts. .................................................. 29 |
| III. | | DAVIS-FROST'S POLICIES PROVIDE COVERAGE FOR BREACH OF CONTRACT AND BREACH OF WARRANTY CLAIMS IF THEY ARE BASED ON PROPERTY DAMAGE CAUSED BY AN OCCURRENCE. ........................................ 31 |
|   | A. | Insurance Coverage Depends on the Application of the Insurance Policy to the Facts of the Case, Not on the Form of Action Chosen by the Plaintiff. ........................................ 31 |
|   | B. | Minnesota's Approach Is Consistent with Authority from Other Jurisdictions. ........................................................ 33 |
|   | C. | UNIC's Cited Cases Are Inapposite Because They Do Not Involve Damage to Third-Party Property Resulting from an Occurrence. .................................................................. 34 |
|   | D. | Davis-Frost Neither Expected Nor Intended the Damage to the Railcars. ................................................................. 35 |
| IV. | | UNIC'S MOTION IS PREMATURE AND DAVIS-FROST IS ENTITLED TO RELIEF UNDER RULE 56(f). ...................... 38 |

CONCLUSION ............................................................................. 39

# TABLE OF AUTHORITIES

## Cases

*Acuity v. Burd & Smith Construction*, 721 N.W.2d 33, 38 (N.D. 2006) ......................................................................................... 38

*American Family Mutual Insurance Co. v. American Girl, Inc.*, 673 N.W.2d 65, 77 (Wis. 2004) .......................................................... 38

*American Family v. Walser*, 628 N.W.2d 605, 612 (Minn. 2001) ................................. 42

*Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn. 1990) ......................................................................................... 34

*Avenson v. Zegart*, 577 F. Supp. 958, 961 (D. Minn. 1984) ......................................... 13

*Bituminous Casualty Corp. v. Bartlett*, 240 N.W.2d 310 (Minn. 1976) ......................................................................................... 43

*Boone v. PCL Const. Servs., Inc.*, No. 05-24, 2005 WL 1843354, at *4 (D. Minn. Aug. 2, 2005) ....................................................... 45

*Bor-Son Bldg. Corp. v. Employers Commercial Union Ins. Co.*, 323 N.W.2d 58, 63 (Minn. 1982) .......................................................... 36

*Bright Wood Corp. v. Bankers Standard Ins. Co.*, 665 N.W.2d 544, 548-49 (Minn. Ct. App. 2003) ............................................ 21, 26, 27

*Brown v. State Auto & Cas. Underwriters*, 293 N.W.2d 822, 825 (Minn. 1980) ......................................................................... 34

*Carpole's Inc. v. Insurance Co. of North America*, 544 F.Supp. 6, 7-8 (D. Minn. 1982) .......................................................... 27

*Corn Plus Coop v. Continental Cas. Co.*, 444 F.Supp.2d 981 (D. Minn. 2006) ........................................................................ 15, 16

*Crawford-El v. Britton*, 523 U.S. 574, 599 n.20 (1998) ............................................... 45

*Dave's Cabinets, Inc. v. Komo Machine, Inc.*, No. 05-854, 2006 WL 1877075, at *6 (D.Minn. July 6, 2006) ..................................... 21

*Donnelly Bros. Const. Co. v. State Auto Prop. & Cas. Ins. Co.*, ---
N.W.2d ---, 2009 WL 234270, at *4 (Minn. Ct. App. Jan 26, 2009)....................... 29, 31

*Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins.
Co.*, 535 N.W.2d 337, 341 (Minn. 1995)......................................................... 31

*Federated Mutual Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751,
757 (Minn. 1985)......................................................................................... 15, 17

*Ferrell v. West Bend Mut. Ins. Co.*, 393 F.3d 786, 789, 795 (8th Cir.
2005) ........................................................................................................... 39

*Florists' Mut. Ins. Co. v. Wagners Greenhouses, Inc.*, 535 F.Supp.2d
947, 951 (D. Minn. 2008) ...........................................................21, 24, 26, 37

*Franklin v. Western National Mut. Ins. Co.*, 574 N.W.2d 405, 407
(Minn. 1998) .............................................................................................. 41

*Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.*, 407 P.2d
868, 871-72 (Cal. 1965)................................................................................. 23

*Goodyear Rubber & Supply Co., Inc., v. Great American Ins. Co.*,
471 F.2d 1343, 1345-46 (9th Cir. 1973)......................................................... 23

*Hauenstein v. Saint Paul-Mercury Indem. Co.*, 65 N.W.2d 122, 126
(Minn. 1954) .............................................................................................. 42

*Hotel des Artistes, Inc. v. Gen. Accident Ins. Co. of Am.*, 775
N.Y.S.2d 262, 268 (N.Y. App. Div. 2004) ..................................................... 39

*In re Silicone Implant Ins. Coverage*, 667 N.W.2d 405, 415 (Minn.
2003)........................................................................................................29, 33, 34, 35

*Integrity Mutual Insurance Co. v. Klampe*, No. A08-0443, 2008 WL
5335690, at *4 (Minn. Ct. App. Dec. 23, 2008) ......................................... 41, 43

*Lamar Homes, Inc. v. Mid-Continent Casualty Co.*, 242 S.W.3d 1, 8-
10 (Tex. 2007) ............................................................................................. 38

*Mandich v. Watters*, 970 F.2d 462, 465 (8th Cir. 1992) ................................ 34

*Maxwell v. K Mart Corp.*, 844 F. Supp. 1360, 1365 (D. Minn. 1994)............................ 12

*Northern States Power Co. v. Fidelity & Cas. Co.*, 523 N.W.2d 657,
662 (Minn. 1994)......................................................................................... 29

iv

*Ohio Casualty Insurance Co. v. Terrace Enterprises*, 260 N.W.2d 450 (Minn. 1977) ................................................................................ 43

*Parr v. Gonzalez*, 669 N.W.2d 401, 406 (Minn. Ct. App. 2003) ................. 13, 30, 34

*Reinsurance Ass'n of Minn. v. Timmer*, 641 N.W.2d 302, 314 (Minn. Ct. App. 2002) ......................................................................................... 21, 40

*SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 314 (Minn. 1995) ................................................................................................. 13

*Sphere Drake Ins. Co. v. Tremco, Inc.*, 513 N.W.2d 473, 479 (Minn. Ct. App. 1994) ......................................................................................... 16, 18

*St. Paul Fire & Marine Ins. Co. v. Futura Coatings, Inc.*, 993 F.Supp. 1258, 1264 (D. Minn. 1998) ....................................................... 28

*Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 880 (Minn. 2002) ..................... 13, 37

*Tony Eiden Co. v. State Auto Property and Cas. Ins. Co.*, No. A07-2222, 2009 WL 233883, at *2 (Minn. Ct. App. Jan. 26, 2009) ........... 30, 33

*U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 884-85 (Fla. 2007) ................................................................................................. 38

*United States Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1247-48 (Ill. Ct. App. 1995) ..................................................................... 23

*Vandenberg v. Superior Court*, 982 P.2d 229, 244 (Cal. 1999) ..................................... 38

*Wanzek Construction, Inc. v. Employers Insurance*, 679 N.W.2d 322, 327 (Minn. 2004) ...................................................................................... 37

*Web Construction, Inc. v. Cincinnati Ins. Co.*, No. 06-5061, 2007 WL 4230751, at *6 (D. Minn. 2007) ................................................... 37, 42

*Western Cas. & Sur. Co. v. Polar Panel Co.*, 457 F.2d 957, 960-61 (8th Cir. 1972) ......................................................................................... 17

*Western Nat'l Mutual Ins. Co. v. Barbes*, No. A05-2011, 2006 WL 1704201, at *1, 4 (Minn. Ct. App. June 20, 2006) ............................... 41

*Western National Mutual Insurance Co. v. Frost Paint & Oil Corp.*, No. C3-97-1118, 1998 WL 27247 (Minn. Ct. App. Jan. 27, 1998) ............. passim

*Westfield Ins. Co. v. Kroiss*, 694 N.W.2d 102, 106 (Minn. Ct. App. 2005) ................................................................................................ 30, 31

**Treatises**

2 Allan D. Windt, Insurance Claims and Disputes § 11:7 (5th ed. 2008) ...................................................................................................... 33

9 Couch on Ins. § 126:3 (3d ed. 2008) ......................................................... 33

# INTRODUCTION

This case presents a coverage dispute between defendant Davis-Frost, Inc.

("Davis-Frost"), a manufacturer of paints and coatings, and its liability insurance carrier,

United National Insurance Company ("UNIC").  At issue is whether UNIC must

indemnify Davis-Frost for a $1.3 million judgment obtained by defendant Gunderson,

Inc. ("Gunderson"), a railcar manufacturer, for damages arising from Davis-Frost's

allegedly defective paint.  UNIC sold comprehensive general liability and excess liability

policies to Davis-Frost covering the periods July 29, 2000-July 29, 2001 and July 29,

2001-July 29, 2002.

From August 2000-February 2001, Gunderson manufactured 431 railcars using

Davis-Frost paint, all of which were delivered and placed in service shortly thereafter.

The paint on the railcars developed bubbles, blisters and cracks within approximately

eight weeks of application of the paint, exposing the metal railcar substrates to the

elements and triggering the oxidation process.  Gunderson settled its customers' claims

regarding those damages for a total of $1.3 million.

In May 2005, Gunderson sued Davis-Frost in Federal District Court in Oregon

("Underlying Action").  Davis-Frost denied (and continues to deny) that its paint was

defective.  In February 2008, the jury in the Underlying Action entered judgment in favor

of Gunderson for $1.3 million, plus interest and costs.  Davis-Frost's appeal from the

judgment is pending before the United States Court of Appeals for the Ninth Circuit.

UNIC is defending Davis-Frost in the Underlying Action under a reservation of rights.

Shortly after entry of the judgment, UNIC filed this action seeking a declaration that

Davis-Frost (or Gunderson as garnishor if the judgment is affirmed on appeal) has no coverage under the Policies for the judgment.

UNIC requests summary judgment on three grounds. First, UNIC asserts that the judgment is not covered because all of the property damage to the railcars falls within the "your product" exclusion in the policies. Minnesota courts have interpreted the "your product" exclusion narrowly and applied it only where the insurer can demonstrate that insured's product caused no damage to any third-party property. UNIC relies on a handful of cases where the court found either that the insured's product caused no damage to any other property (*e.g.*, *Florists' Mutual*) or that the third-party property damage occurred only during efforts to repair the insured's defective product (*e.g.*, *Bright Wood*). These decisions are factually inapposite here, given the well-documented evidence of corrosion of the railcar substrates, damage to decals and stenciling and associated labor costs, which are not Davis-Frost's product.

Second, UNIC claims that its coverage was never "triggered" because there is no evidence that any property damage occurred to the railcars during either of the UNIC policy periods. The date of onset of the railcar damage was not an element of any claim or defense in the Underlying Action, and it was not decided by the jury. Nevertheless, scores of photographs were introduced into evidence of pervasive, wide-spread corrosion on the railcar substrates. This corrosion damage did not develop overnight, and experts for both Davis-Frost and Gunderson have opined that the onset of the corrosion was shortly after the cars were painted, during UNIC's first—or at the very latest—second policy period. Even without further discovery, this evidence would support entry of

summary judgment against UNIC on the "trigger of coverage" issue, but at a minimum, it creates a material fact issue.

Finally, UNIC argues that Gunderson's claims for breach of warranty and breach of contract against Davis-Frost in the Underlying Action are uninsured under the "business risk doctrine." As the Minnesota Supreme Court has held, however, coverage depends upon "the specific terms of the contract," not on judicially-created principles. Thus, the availability of coverage depends solely on whether the damages fall within the policy's grant of coverage, not on the form of the pleading chosen by the claimant's attorney. Here, the judgment against Davis-Frost in the Underlying Action represents costs to repair the damage to Gunderson's customers' railcars, which is "property damage" covered by UNIC's liability insurance policies.

Davis-Frost therefore respectfully requests that UNIC's summary judgment motion be denied in its entirety, or, in the alternative, that the motion be continued to allow the parties to take discovery under Federal Rule of Civil Procedure 56(f).

## STATEMENT OF ADDITIONAL DOCUMENTS
## WHICH COMPRISE THE RECORD

In addition to the documents submitted by UNIC and Gunderson, the documentary record with respect to this motion consists of the following:

1. Affidavit of Joy R. Anderson ("Anderson Aff."), with Attached Exhibit:

    (A) Excerpts from UNIC Commercial General Liability and Commercial Umbrella Liability policies issued to Davis-Frost ("UNIC Policy Excerpt")

2. Affidavit of Heather Beasley ("Beasley Aff.") with Attached Exhibits:

    (1) Curriculum vitae of Timothy D. Race

3

(2)    Letter Report of Timothy D. Race, Vice President of Corrosion Control
Consultants & Labs, Inc., to Heather Beasley and Nathan McClintock,
dated April 18, 2007 ("Race Letter Report")

## STATEMENT OF ISSUES

I.    Does all of the property damage to the railcars fall within the "your product"
exclusion in the UNIC policies, or do the corrosion of the metal railcar substrates,
harm to decals and stenciling, associated labor and other direct and consequential
damages constitute covered third-party property damage?

II.   Did at least some property damage occur to the railcars painted with Davis-Frost's
paint during UNIC's policies, thereby triggering coverage under those policies?

III.  Do the UNIC policies provide coverage to Davis-Frost for damages caused by an
occurrence of property damage that resulted in the judgment for Gunderson on its
breach of contract and breach of warranty claims?

IV.   Is Davis-Frost entitled to a Rule 56(f) dismissal or continuance?

## STATEMENT OF DISPUTED FACTS

Material disputed facts relative to the present motion by UNIC for summary

judgment include the following:

1.    Davis-Frost did not expect or intend that its paint would fail when it sold

the paint to Gunderson.  (*See* Transcript of the Trial of Gunderson v. Davis Frost, US

District Court, District of Oregon, Court File No. CV-05-699 MO ("Trial Transcript"),

attached to Affidavit of Attorney Aaron M. Simon (In Support of UNIC's Motion for

Summary Judgment) ("Simon Aff."), Testimony of Kris Krishnamoorthy, at 365:20-

366:11, 378:1-9, 417:19-25, 419:12-14; Trial Transcript, Testimony of Calvin Henning,

at 756:15-19, 758:16-22, 781:16-782:4, 15-19.)

2.     The failure of the Davis-Frost paint on the TTX and Pacer railcars began during the first UNIC policy period.  (Affidavit of Michael R. Seidl ¶ 12, Ex. D, Excerpt of Perpetuation Deposition of Georgianna Gideon ("Gideon Dep."), at 25:9-24; Beasley Aff., Ex. 2, Race Letter Report; Affidavit of James Burke ("Burke Aff.") ¶ 10.)

3.     The metal substrates of the TTX and Pacer railcars began to rust and corrode during the first, or at the latest, the second UNIC policy period.  (Beasley Aff., Ex. 2, Race Letter Report; Burke Aff. ¶ 10.)

4.     The decals and stenciling on the TTX and Pacer railcars were damaged by bubbling, blistering and cracking of the paint during the first or second UNIC policy period.  (Burke Aff. ¶ 11.)

5.     The settlement payments made by Gunderson to TTX and Pacer included the costs of repairing the railcars for the property damage allegedly caused by Davis-Frost paint and associated consequential damages.  (*See* Trial Transcript, Testimony of Thomas Sass ("Sass Testimony"), at 115:8 – 116:9, 122:5-17; Trial Transcript, Testimony of Cheryl Lee Urness ("Urness Testimony"), at 152:17-20.)

FACTUAL BACKGROUND

**I.     DAVIS-FROST'S GENERAL COMMERCIAL LIABILITY POLICIES**

UNIC issued to Davis-Frost two commercial general liability policies ("CGLs"), covering the periods July 29, 2000-July 29, 2001 and July 29, 2001-July 29, 2002, with per-occurrence and aggregate limits for products-completed operations of $1 million. (Anderson Aff., Ex. A, UNIC Policy Excerpt, at pp. 12-13.)  For each of these policy periods, UNIC also issued to Davis-Frost an excess insurance policy with per-occurrence

and aggregate limits for products-completed operations of $4 million.  (Id. at pp. 14-15.)
The insuring agreements, exclusions and other operative terms of the two CGLs are
identical.  The insuring agreements in the CGLs policies provide that UNIC will pay
"those sums that the insured becomes legally obligated to pay as damages because of
'bodily injury' or 'property damage'" if the injury or damage is caused by an
"occurrence" during the policy period.  (Id. at Section I(A), ¶1.)  The policies define
"occurrence" as "an accident, including continuous or repeated exposure to substantially
the same general harmful conditions."  (Id. at Section V, ¶12.)

## II.    DAMAGES TO THE TTX AND PACER INTERNATIONAL RAILCARS

During the first UNIC policy period, Davis-Frost sold water-based acrylic paint to
Gunderson, and Gunderson applied the paint to 431 railcars it was manufacturing for two
customers, TTX and Pacer.  (Affidavit of Michael R. Seidl ("Seidl Aff.") ¶¶ 10-11.)
Gunderson applied the paint to 200 cars for TTX between August and November 2000,
and to 231 cars for Pacer between January and February 2001.  (Id.)  The TTX cars were
shipped between August 29, 2000 and November 2, 2000; and the Pacer cars were
shipped between January 1, 2001 and February 15, 2001.  (Seidl Aff., Ex. B, List of
Gunderson Production Runs.)  During the same time that Gunderson was painting the
TTX cars, it also applied the same Davis-Frost paint, in a different color, to cars
manufactured for Burlington Northern Santa Fe Railroad ("BNSF").  (Seidl Aff. ¶ 11; Ex.
C, List of BNSF Production Runs.)

In 2003, TTX advised Gunderson that the paint was blistering on some of its cars
painted with Davis-Frost paint.  (Trial Transcript, Testimony of Thomas Sass ("Sass

Testimony"), at 110:11-16.)  TTX made a warranty claim to Gunderson for the paint

failure in August 2003.  (Id. at 118:9-19.)  Pacer also made a warranty claim to

Gunderson for paint failure in 2003.  (Trial Transcript, Testimony of Thomas Rodney

Wallace ("Wallace Testimony"), at 476:10-15.)  Gunderson inspected some of the TTX

cars and discovered extensive blistering and evidence of rust and corrosion on the steel

substrate of the cars.  (Id. at 464:4-6.)  On some cars, "the paint had come off to the point

where it was bleeding with what appeared to be rust on the car."  (Id. at 464:8-10.)

Pictures of the TTX cars taken in October and November 2003 by Pat Egan, a consultant

for Gunderson, graphically illustrate the damage to the cars:  extensive blistering and

ruptured areas in the paint, exposing areas of the metal substrate, which have rusted and

corroded.  (Seidl Aff. ¶ 14, Ex. F.)

In addition, the decals on Gunderson's cars had been damaged; in some instances,

they were obliterated or lifted entirely off of the railcar.  (Wallace Testimony, at 463:8-

13; 464:8-9.)  The Egan photographs show that some of the decals were almost

completely obscured by blisters and rust.  (Seidl Aff. ¶ 14, Ex. F.)  This is a critical

problem, because most of the decals are required to be on the railcar under regulations

promulgated by the Federal Railroad Administration or the American Association of

Railroads.  (Wallace Testimony, at 463:14-25; *see* 49 CFR §§ 215.301–215.303, current

through Feb. 11, 2009.)

Gunderson made a warranty claim to Davis-Frost on August 29, 2003.  (Wallace

Testimony, at 475:20 – 476:9.)  However, Davis-Frost believed that the blistering

problem was caused by Gunderson applying paint too thickly, based on its experience of

complaints from other customers and the conclusions of its chemist, who performed tests on test panels and a Gunderson car. (Trial Transcript, Testimony of Calvin Henning ("Henning Testimony"), at 756:15-19.) Davis-Frost consistently expressed this position to Gunderson after Gunderson reported the blistering problem and later argued this position at trial in the Underlying Action. (*See id.* at 758:16-22, 781:16 – 782:4, 15-19; Krishnamoorthy Testimony, at 427:4-8, 431:5-10.)

Gunderson settled Pacer's claim in October 2004 for $100,000. (Sass Testimony, at 115:8-116:9.) The settlement was based on the amount that the Pacer representative felt was needed to "take care of his cars." (Id. at 115:8-116:9.) TTX first demanded $1.9 million. (Id. at 121:5.) To evaluate the reasonableness of this offer, Gunderson had a car repainted to determine the approximate cost of removing and replacing the paint. (Id. at 122:18-23.) Gunderson found that the cost for the labor for blasting and repainting the car was between $7,000 and $8,000, in addition to the cost of the paint and decals required for each car. (Wallace Testimony, at 461:17-25.) In October 2006, Gunderson settled the TTX claim for $1.2 million. (Sass Testimony, at 118-23 – 119:7.) This represented what TTX and Gunderson both felt, based upon their negotiations, was a reasonable amount for the cost of repairing all of the damaged cars. (Sass Testimony, at 122:5-17.)

## III.    THE TIMING OF THE PAINT FAILURE AND THE RESULTING RUST AND CORROSION

Multiple sources indicate that the paint blisters and ruptures, and the resulting rust and corrosion of the metal substrates of the cars, occurred between July 29, 2000 and July

29, 2002—that is, within the periods covered by the UNIC policies.

## A.    BNSF Investigations

Georgianna Gideon, BNSF's paint chemist, testified in a perpetuation deposition that in the latter part of 2001, while UNIC's second policy was in effect, BNSF began noticing problems with the paint on its cars, including those painted by Gunderson in the fall of 2000, the same time that Gunderson was painting the TTX railcars.  (Seidl Aff. ¶ 12, Ex. D, Excerpt of Perpetuation Deposition of Georgianna Gideon ("Gideon Dep.") at 25:9-24.)  Gideon testified that "it was like the paint had bubbled in between like layers or something and lifted up."  (Id.)

## B.    Opinion of Davis-Frost's Expert in the Underlying Action

Timothy D. Race, an expert retained by Davis-Frost in the Underlying Action to investigate the cause of the paint failure, performed tests that indicated the railcars were damaged within UNIC's policy periods.  In a letter report dated April 18, 2007, expressing his expert opinion, Race stated the following:

- The paint blistering would have begun when the paint was first exposed to temperatures higher than the bake temperature of 120 degrees.

- Steel heated in direct sunlight on warm days may easily exceed temperatures of 120 degrees.

- Because of the wide distribution and constant circulation of the railcars, "it is safe to assume that most if not all of the series 724000-724200 cars had experienced the conditions necessary to cause blistering by July 31, 2001."

- Corrosion of the railcars would have begun "as soon as cracked paint or paint with ruptured blister[s] was exposed to water from condensation or precipitation."

- Because the cars would have had blisters and cracked paint no later than July

31, 2001, "it is reasonable to assume that cars with corrosion associated with cracking and blistering paint had started to corrode by August 31, 2001, or earlier depending on the onset of exposure to moisture[.]"

(Beasley Aff., Ex. 2, Race Letter Report.)

## C.  Opinion of Gunderson's Expert

James Burke, a paint and coatings consultant who was hired by Gunderson to testify in the Underlying Action, also performed tests indicating that the blistering of the paint and rusting of the metal substrate would have occurred during UNIC's policy periods.  Burke painted test panels with the same Davis-Frost paint used on the TTX and Pacer railcars and found that the paint bubbled, blistered, and cracked, exposing the metal substrate, within eight weeks of the time the panels were painted.  (Burke Aff. ¶¶ 6-8.) Burke has opined:

- The blistering on the railcars in question began to occur within eight weeks from the time they were painted.  (Id. ¶ 10.)

- The bubbling and blistering caused the paint film to crack, resulting in the exposure of the metal substrate of the cars.  (Id.)

- Accordingly, the metal substrate would have been exposed to air, heat, cold, wind, and moisture soon after the bubbling and blistering began.  (Id.)

- The exposure of the uncoated metal substrates to the elements caused rust and corrosion of the metal substrates, damaging the metal itself.  (Id.)

- The rusting and corrosion process would have begun immediately upon the metal substrates being exposed simultaneously to moisture and oxygen.  (Id.)

- The paint was designed and intended to be a protective coating, not merely decorative, so its failure caused the metal substrates of the cars to be damaged. (Id.)

- The bubbling and blistering followed by the rusting and corrosion of the metal

substrates near the decals on the railcars lifted the decals from the surfaces of the railcars and caused them to be partially or completely obliterated.  (Id. ¶ 11.)

If all of the railcars blistered within eight weeks, as Burke opines, this would be well within UNIC's first policy period.  The last of the railcars were painted and delivered in February 2001, and UNIC's insurance coverage extends to July 2002.  (Anderson Aff., Ex. A, UNIC Policy Excerpt, at 13.)

## VI.    THE UNDERLYING ACTION

In May 2005, Gunderson sued Davis-Frost in Federal District Court in Oregon, alleging that the paint Davis-Frost sold Gunderson for its railcars was defective. (Plaintiff United National's Second Amended Complaint ("Compl.") ¶ 4.1; Def. Davis-Frost, Inc.'s Answer to UNIC's Second Amended Complaint and Counterclaim ("Answer") ¶ 14.)  Davis-Frost denied liability, claiming that the paint was not defective, and that Gunderson's application of the paint caused the paint to fail.  The case went to trial, and the jury returned a verdict for Gunderson in the amount of $1.3 million (the total amount of the TTX and Pacer settlements), plus prejudgment interest and taxed costs.[1]  (Simon Aff., Ex. 3, Jury Verdict Form.)  The length of time between Gunderson's painting of the railcars and the first appearance of the bubbling and blistering of the paint was not an element of any of the causes of action in the Oregon Trial and was therefore not decided by the jury.  (Seidl Aff. ¶ 6; Beasley Aff. ¶ 6.)  Davis-Frost's appeal from the judgment in the Underlying Action is pending before the United States Court of

---

[1] Davis-Frost denies that its paint was defective; Davis-Frost's position continues to be that Gunderson's over-application of the paint caused the paint to fail.  (Beasley Aff. ¶ 3.)

Appeals for the Ninth Circuit.  (Beasley Aff. ¶ 2.)

UNIC, along with two other insurers that issued CGL policies to Davis-Frost for successive coverage periods, defended Davis-Frost in the Underlying Action, subject to a reservation of rights to later deny coverage.  (Compl. ¶ 22; Answer ¶ 35.)  After the judgment in the Underlying Action, Davis-Frost and Gunderson settled claims with the other two insurers.  UNIC refused to settle and is instead litigating its coverage obligations to Davis-Frost.

## ARGUMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment may only be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  In evaluating UNIC's motion, the Court must give defendants the benefit of all inferences to be drawn from the facts.  *Maxwell v. K Mart Corp.*, 844 F. Supp. 1360, 1365 (D. Minn. 1994).  Summary judgment is considered an "extreme remedy that should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for doubt and unless the nonmoving party is not entitled to recover under any discernible circumstances."  *Avenson v. Zegart*, 577 F. Supp. 958, 961 (D. Minn. 1984).  Because UNIC has failed to meet this standard, its motion for summary judgment must be denied.

In a dispute involving an insurance contract, the insured has the burden of establishing a prima facie case of coverage under the policy.  *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 314 (Minn. 1995).  Once this is established, the burden shifts

to the insurer to demonstrate the applicability of an exclusion. *Id.* Exclusionary

provisions should be interpreted in accordance with the expectations of the insured and

construed strictly against the insurer. *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877,

880 (Minn. 2002). Unambiguous language in an insurance contract must be given its

plain and ordinary meaning, and any ambiguity in a policy must be construed in favor of

the insured. *Parr v. Gonzalez*, 669 N.W.2d 401, 406 (Minn. Ct. App. 2003).

## I.  THE "YOUR PRODUCT" EXCLUSION DOES NOT APPLY TO THE PROPERTY DAMAGES TO THE TTX AND PACER RAILCARS

UNIC asserts that with the exception of what it describes as "incidental" rust on

the TTX and Pacer railcars, all of the damages were to Davis-Frost's paint. (Plaintiff's

Motion for Summary Judgment ("UNIC's Mem.") at 16.) However, the railcar damage

plainly extends beyond cosmetic problems with the paint; the railcar substrates

themselves were rusted and corroded, and the decals and stenciling were damaged as

well. (Wallace Testimony, at 464:4-10; Seidl Aff. ¶ 14, Ex. F.) Davis-Frost supplied

only the paint for the cars; the railcar substrates and decals and all labor associated with

manufacturing the railcars are not Davis-Frost's "product." (*See* Seidl Aff. ¶ 5.) Nor did

Davis-Frost apply the paint or provide any other labor with respect to the manufacture of

the railcars. (*See id.*) Therefore, the labor costs of blasting and repainting the railcars

and reapplying decals and stenciling—estimated at between $7,000 and $8,000 per car—

are not excluded as Davis-Frost's "work." (*See* Wallace Testimony, at 461:17-25.)

Finally, UNIC cites to several cases holding that "incidental" damages to third-

party property are not covered. UNIC's reliance on these cases is misplaced, however,

because the damages to the railcars all arose from the failure of the Davis-Frost paint, not remedial actions to repair the damage.

### A. Davis-Frost Has Established Property Damage to the TTX and Pacer Railcars.

UNIC claims that it is entitled to summary judgment under the "your product" exclusion for the judgment in the Underlying Action. The "your product" exclusion bars coverage for "'Property damage' to 'your product' arising out of it or any part of it." (Anderson Aff., Ex. A, UNIC Policy Excerpt, Section I(A), Exclusion k.) The term "property damage" is defined in the UNIC policies as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." (Id., Section V, ¶ 15.) Finally, the term "your product" is defined as:

> a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
> (1) you;
> (2) others trading under your name; or
> (3) a person or organization whose business or assets you have acquired; and
>
> b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

(Id., Section V, ¶ 18.) When the insured's faulty product causes damage to third-party property, the "your product" exclusion does not apply. *See Corn Plus Coop v. Continental Cas. Co.*, 444 F.Supp.2d 981 (D. Minn. 2006), *aff'd* 516 F.3d 674 (8th Cir. 2008); *Federated Mutual Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn. 1985); *Sphere Drake Ins. Co. v. Tremco, Inc.*, 513 N.W.2d 473, 479 (Minn. Ct. App.

1994), *rev. denied* (April 28, 1994); *Western National Mutual Insurance Co. v. Frost Paint & Oil Corp.*, No. C3-97-1118, 1998 WL 27247 (Minn. Ct. App. Jan. 27, 1998), *rev. denied* (April 14, 1998). In this case, like those cited above, the "your product" exclusion is inapplicable to the significant damage caused to third-party property.

In *Corn Plus,* the insured contractor performed welds on a piping system associated with an expansion of an ethanol plant. 444 F.Supp.2d at 983. Approximately 80% of the insured's welds were defective, resulting in corrosion and bacterial contamination of corn mash used in the ethanol production facility. *Id.* The insured settled with the owner of the ethanol plant and sought indemnification under its general liability insurance policy. The district court found that damage to the corn mash constituted covered third-party property damage, "separate and apart from the defective welding work." *Id.* at 989. Only the cost of redoing the insured's defective welds was excluded by the "your work" exclusion. *Id.*

Like the present case, *Concrete Units* involved a coverage claim by a product supplier for damage that arose from its allegedly defective product. The insured supplied concrete used in construction of a grain elevator. 363 N.W.2d at 753. The concrete problems caused significant delays in completion of the work, resulting in loss of use of the elevator to the owner, and damaged metal reinforcing rods and slip-forms used in the construction process. *Id.* at 756-57. In finding partial coverage for the claim, the court determined that the damages for loss of use were not barred by the "your product" exclusion because the elevator was not the insured's product. *Id.* at 757 n.4. The court also found coverage for the replacement cost and labor associated with the reinforcing

rods and slip-forms. *Id.* at 757. *Concrete Units* is also noteworthy in that even though the insured's concrete was incorporated into the elevator, the court found that the "your product" exclusion did not bar coverage for loss of use because the elevator was not the insured's "product." *Id.*; *see also Western Cas. & Sur. Co. v. Polar Panel Co.*, 457 F.2d 957, 960-61 (8th Cir. 1972) ("The exclusionary clause reaches and carves out of the policy the damage to the particular product but not the overall damage that the incorporation of the defective product causes to the entire structure.").

*Sphere Drake* is another case cited by UNIC that involved application of the "your work" exclusion. UNIC fails to mention, however, that like *Corn Plus,* the court found coverage for damage to third-party property. In *Sphere Drake*, a contractor ("Melich") sought coverage for claims that its failure to properly clean and seal the concrete surface of a parking ramp before application of a protective membrane allowed moisture to penetrate the membrane and caused damage to the concrete structure and other property. 573 N.W.2d at 475-76. Melich's insurance carrier sought a declaration that its policy provided no coverage for any of the damages to the ramp. *Id.* at 476. The Minnesota Court of Appeals found that with the exception of costs associated with redoing Melich's allegedly defective work, all other repair costs associated with the membrane and parking ramp structure were covered third-party property damage, not barred by the "your work" exclusion. *Id.* at 479-80.

As in all three of these cases cited by UNIC, the damages represented in the judgment against Davis-Frost are for property damage to third-party property (the TTX and Pacer railcars), and thus are covered under UNIC's policies. Gunderson's

inspections of the third-party-owned railcars revealed rust on the metal substrates of the

cars, as well as damage to the cars' decals. (Wallace Testimony, at 463:8-13, 464:4-9;

Seidl Aff., Ex. F.) These physical injuries to the substrates of the cars and the decals

qualify as "property damage," bringing the claim into the scope of the coverage of

UNIC's policies.[2] In fact, UNIC has acknowledged in its brief that the rust on the metal

substrate qualifies as property damage to the railcars. (*See* UNIC's Mem., at 19 n. 4)

("For purposes of this motion **only**, United National will not dispute any allegations by

the defendants that rust is property damage.") (emphasis original).

The case that most closely parallels the present action is *Western National*. In

*Western National*, Spartan Products, Inc. ("Spartan"), a manufacturer of boat trailers,

incurred significant damages and lost profits as a result of corrosion damage to its

products. 1998 WL 27247, at * 1. Spartan claimed that the damages resulted from

allegedly defective paint manufactured by the insured, Frost Paint & Oil Corp. ("Frost

---

[2] UNIC claims that the settlement payments by Gunderson to TTX and Pacer do not account for any property damage to the railcars, including rust and corrosion repair. (UNIC's Mem. at 6.) This statement is based on selective citation of only a small portion of a single witness's testimony, and is misleading as a representation of the full trial record. First, the testimony of Robert Pokorski, the vice president of equipment of TTX, which is cited by UNIC, simply states that the settlement was based on the estimated cost of repainting a railcar multiplied by the number of cars but does not describe all steps associated with the repair. (Trial Transcript, Testimony of Robert Pokorski, at 274:15-20.) The trial transcript contains evidence of the process of painting a car, and that process includes sandblasting to remove rust and to create a rough surface, and adding decals. (Trial Transcript, Testimony of Cheryl Lee Urness, at 152:4-20; 164:8-15.) There was no requirement in the Underlying Action that the damages be broken down by category to those attributable to property damage and those attributable to some other factor. (*See* Simon Aff., Ex. 3, Jury Verdict Form.) Accordingly, a genuine issue of material fact exists regarding the direct and consequential damages caused by the property damage to the railcars.

Paint"). *Id.* Frost Paint sued its insurer, Western National Mutual Insurance Company ("Western National"), for recovery of $590,000 in damages to the trailers and lost profits. *Id.* The Court of Appeals rejected the argument that the damages were barred by the "your work" and other "business risk" provisions, finding that "the exclusions cited by the insured do not preclude coverage for property damage to Spartan's trailers or for the consequential lost profit damages." *Id.* at *4. The trial court had found:

> (1) the Spartan trailers sustained substantial injury in the form of rust and corrosion due to Frost's paint; and (2) Spartan incurred costs for removing and replacing the paint, costs for repairing the rust and corrosion on the trailers, and significant lost profits because of the rust and corrosion on its trailers.

*Id.* at *3. The Court of Appeals held that "under these circumstances, the trial court's findings that there was 'property damage' and that Spartan's lost profits had a causal connection to the property damage" were not clearly erroneous. *Id.* (citations omitted). Like *Concrete Units* and *Sphere Drake*, the court in *Western National* held that the "your product" and other business risk exclusions were inapplicable because "Spartan sought recovery for the damages to the trailers themselves, and not just for replacing the paint." *Id.* In short, the circumstances of the loss and insurance coverage before the court in *Western National* are almost identical to those in the case *sub judice*. Thus, while not "precedential," the analysis in *Western National* presents persuasive authority.[3]

---

[3] *See, e.g., Reinsurance Ass'n of Minn. v. Timmer*, 641 N.W.2d 302, 314 (Minn. Ct. App. 2002) (stating that unpublished cases may be persuasive authority). *Western National* has been cited multiple times as a persuasive opinion. *Id.* ("While not precedential, we are persuaded by the Frost Paint analysis."); *Dave's Cabinets, Inc. v. Komo Machine, Inc.*, No. 05-854, 2006 WL 1877075, at *6 (D.Minn. July 6, 2006).

UNIC attempts to marginalize *Western National* by claiming that it has been "eroded" by recent Minnesota insurance coverage decisions.  However, the cases to which UNIC cites, *Florists' Mutual* and *Bright Wood* (discussed in detail *infra*), do not criticize—or even mention—*Western National*.  This is almost certainly because the *Florists' Mutual* and *Bright Wood* courts were addressing very dissimilar fact patterns from those in *Western National* and the present case.  *See Florists' Mut. Ins. Co. v. Wagners Greenhouses, Inc.*, 535 F.Supp.2d 947, 951 (D. Minn. 2008); *Bright Wood Corp. v. Bankers Standard Ins. Co.*, 665 N.W.2d 544, 548-49 (Minn. Ct. App. 2003).

UNIC spends nearly six pages of its brief attempting to identify "distinctions" between the present case and *Western National*.  To the extent they are distinctions at all, they are distinctions without a difference.[4]  UNIC fixates on the fact the insured and insurer "stipulated that $600,000 was a reasonable damage figure."  1998 WL 27247, at * 2.  UNIC reads too much into this stipulation.  A stipulation as to the ***amount*** of the damage is not the same as stipulating to the classification of the damage (*i.e.*, damage to "your product" versus third-party property damage).  In fact, the opinion actually contradicts UNIC's claim that the insurer conceded coverage for damages to the insured's

---

[4] For example, UNIC claims that while *Western National* involved allegations of both corrosion and rust damage, the present case is limited to rust.  (UNIC's Mem. at 25-26.)  It is not clear that there is any meaningful distinction in the present context between "corrosion" and "rust" and "oxidation."  All involve deterioration of metal through exposure to moisture.  *See, e.g., Webster's New Collegiate Dictionary* 253, 1007 (1973) (defining "corrode" as "to wear away gradually usu. by chemical action … <the bare metal will corrode after a few weeks of exposure to the weather>"; defining "rust" as "the reddish brittle coating formed on iron esp. when chemically attacked by moist air …[or] a comparable coating produced on a metal other than iron by corrosion.").  In any case, as in *Western National*, the record in this case contains evidence of both rust and corrosion to the railcars.  Burke Aff. ¶ 10.)

product. As the court observed, "[t]he insurer argues that the policy's business risk exclusions (m), (n), and (o) apply because the risk that Frost's paint would fail was an uninsurable 'business risk.'" *Id.* at 3. The court then found that "the exclusions cited by the insurer do not preclude coverage for property damage to Spartan's trailers or for the lost consequential damages." *Id.*

Similarly unavailing is UNIC's claim that absent the stipulation, the court in *Western National* would have excluded coverage for costs of removing and replacing the defective paint. (UNIC's Mem. at 24.) When an insured's product is incorporated into another product or entity owned by a third-party, and the insured's product causes damage to the third-party product, the "your product" exclusion does not bar coverage for the costs of repairing the third-party product, even if the repair requires removal and replacement of the insured's defective product. *See, e.g., Goodyear Rubber & Supply Co., Inc., v. Great American Ins. Co.*, 471 F.2d 1343, 1345-46 (9th Cir. 1973) (cost of removing and replacing the insured's defective gasket in a ship was not excluded under "your product"-type exclusion, even though the cost of the gasket itself was excluded); *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.*, 407 P.2d 868, 871-72 (Cal. 1965) (cost of removing and replacing the insured's defective doors was not excluded under "your product"-type exclusion, even though the cost of the doors themselves was excluded); *United States Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1247-48 (Ill. Ct. App. 1995) (cost of removing and repairing insured's asbestos-containing plaster was not excluded under "own product" exclusion, even though cost of the plaster itself was excluded).

In this case, Davis-Frost's product the paint was applied to and incorporated in Gunderson's products, the railcars. The paint failed and caused corrosion and other damages to Gunderson's railcars. (Wallace Testimony, at 463:8-13, 464:4-9; Seidl Aff., Ex. F.) Thus, although the "your product" exclusion may apply to the cost of the replacement paint itself, UNIC's policies still provide coverage for the costs of removing the remaining paint, blasting the rust and corrosion that have formed on the substrates, preparing the cars for repainting, and reapplying replacement paint, decals and stenciling.

UNIC has therefore failed to meet its burden of establishing that all of the $1.3 million judgment falls within the "your work" exclusion, and its motion for summary judgment should be denied.

**B.     The Damage to the Railcars Was Not "Incidental" to the Failure of Davis-Frost's Paint.**

UNIC miscites several Minnesota decisions for the proposition that there is no insurance coverage under a general liability policy for "incidental property damage that is caused by an insured's defective product." (UNIC's Mem. at 18.) The essence of this argument appears to be that since the corrosion and damage to decals and stenciling allegedly arose from the failure of Davis-Frost's paint, the "your product" exclusion takes all of that damage outside of coverage. This argument is baseless. Davis-Frost specifically purchased "products and completed operations" coverage from UNIC to protect it in the event that its product caused bodily injury or property damage to third-parties. To apply the "your work" exclusion as UNIC suggests would eviscerate all

coverage for products liability and deprive Davis-Frost of the benefit of the insurance contract.

UNIC's confusion on this point appears to stem from its misreading of *Florists' Mutual*, 535 F.Supp.2d at 947. UNIC cites *Florists' Mutual* for the proposition that "there is no insurance coverage under a general liability policy for 'incidental' property damage that is caused as a result of an insured's defective product." (UNIC's Mem. at 19.) *Florists' Mutual* held nothing of the sort. In *Florists' Mutual*, the insured ("Wagners") sold defective pansy plugs to a large plant distributor ("Syngenta") for sale to its retail customers. When it was discovered that the pansy plugs were infected, Wagners settled by paying Syngenta for the costs associated with replacing the defective pansy plugs and labor, disposal fees and lost profits arising from the defective plugs. *Id.* at 948-949. Wagners then sought coverage under its comprehensive general liability policy with Florists' Mutual, and Florists' Mutual denied coverage for the claim under the "your products" exclusion. *Id.* at 950. Florists' Mutual claimed that the only evidence of damage was to the infected pansy plugs and that the plugs had not harmed any third-party property. Wagners argued that the labor costs associated with disposal of the defective pansy plugs and reworking flats containing both infected and non-infected plugs constituted third-party property damage. The court disagreed, finding that "[a]ll of the damages covered by Syngenta's settlement payments—including the costs of reworking the flats—are damages incidental to the MPS-infected plugs." *Id.* at 951-52.

Unlike the present case, where there is evidence of rust and corrosion damage and loss and injury to decals and stenciling (*i.e.* third-party property damage), the alleged

damages in *Florists' Mutual* were limited to the infected pansy plugs themselves and the associated labor and lost profits comprising Wagners' settlement with Syngenta. *Id.* No third-party property was damaged.[5] *Florists' Mutual* is therefore inapposite.

UNIC's reliance on *Bright Wood Corp.,* 665 N.W.2d at 544 is also misplaced. In *Bright Wood*, a manufacturer of window component parts ("Bright Wood") sold defective parts to Sherer Brothers, which were incorporated into window units sold to residential contractors. *Id.* at 546. Bright Wood's components were defective because they had not been treated with a wood preservative to prevent rot. After the windows had been installed in a number of residences, Sherer Brothers began to receive complaints of rotting windows. Importantly, the rot that appeared in the windows was limited to the Bright Wood's component parts; none of the other components of the windows exhibited any signs of rot. *Id.* at 546-547. Sherer Brothers repaired the damages and settled with Bright Wood for $8.2 million. Bright Wood then filed a declaratory judgment action against its insurers, which denied coverage. *Id.* at 547.

As part of its claim, Bright Wood sought coverage for incidental damage to the finish, hardware, and weather-stripping that took place during the process of repairing or removing and replacing the windows. The insurers moved for summary judgment based in part on the "your product" exclusion. *Id.* The court granted the insurers' motion, finding that:

---

[5] Although the labor of reworking the flats containing infected and non-infected plugs constituted damage with respect to the reworked, non-infected plugs, it was not *physical* damage. *Florists' Mutual*, 535 F.Supp.2d at 951. Under the definition of "property damage" in the CGLs, some physical injury is required. (Anderson Aff., Ex. A, UNIC Policy Excerpt, Section IV, ¶ 15.)

> **The damage here is based solely on Bright Wood's defective product.** The incidental damage to the finish, hardware, and weather-stripping was incurred only in order to make repairs. No evidence was introduced of damage to any product other than Bright Wood's components, except and insofar as the non-Bright Wood components incurred damage during the repair process.

*Id.* at 548-549. With respect to the "incidental damages" claimed by Bright Wood, the court found that, "[h]ere, the damage to other property occurred because of repairs deliberately undertaken. The resulting damage is not an accidental occurrence." *Id.* at 549.

The critical distinction between *Bright Wood* and the present case is that, unlike *Bright Wood*, substantial third-party property damage is present here in the form of corrosion and rust of the TTX and Pacer railcars and associated decals. (Burke Aff. ¶ 10.) By contrast, only the Bright Wood window components were defective, and those components caused no damage to the surrounding window components provided by other suppliers or to surrounding property in the homes in which the windows were installed. Further, unlike *Bright Wood*, there is no allegation in this case that any of the damages to the TTX or Pacer railcars resulted from repair work on the cars; rather, the damage was caused by the failure of the allegedly defective paint. *See also, Carpole's Inc. v. Insurance Co. of North America,* 544 F.Supp. 6, 7-8 (D. Minn. 1982) (no coverage for loss of fertilizer and associated cleanup costs where the leaking containers caused no damage to third-party property); *St. Paul Fire & Marine Ins. Co. v. Futura Coatings, Inc.*, 993 F.Supp. 1258, 1264 (D. Minn. 1998) (no coverage for costs associated with

replacing defective coating system on cement basins where there was no allegation of damage to the basins or property beyond the coating system).

In summary, *Florists' Mutual, Bright Wood* and other decisions cited by UNIC are distinguishable on their facts; none of them involved coverage claims for damage to third-party property allegedly caused by the insured's product. Given that all of the damages reflected in the judgment in the underlying action arose prior to any repair or replacement to the railcars, and the fact that the railcars themselves suffered substantial damage as a result of the allegedly defective coating, the "your product" exclusion does not apply.

## II.    PROPERTY DAMAGE TO THE RAILCARS OCCURRED DURING UNIC'S POLICY PERIODS.

UNIC claims that there is no evidence that any property damage occurred to the railcars during its policy periods. However, in making this argument, UNIC ignores Minnesota case law regarding the "actual injury" trigger rule, and fact and expert opinion evidence that, at a minimum, creates a fact question about whether the railcars suffered damage during UNIC's policy periods.

### A.    At a Minimum, Whether Property Damage Occurred During UNIC's Policy Periods Is a Genuine Issue of Material Fact.

#### 1.    *Under Minnesota law, CGL policies are triggered if they are in effect when "some" property damage occurred.*

The UNIC policies and other standard CGL forms provide coverage for bodily injury or property damage that "occurs during the policy period." In applying this phrase, Minnesota courts have adopted the "actual injury" trigger rule, which states that a

liability insurance is triggered if it was in effect at a time when property damage occurred. *Northern States Power Co. v. Fidelity & Cas. Co.*, 523 N.W.2d 657, 662 (Minn. 1994); *Donnelly Bros. Const. Co. v. State Auto Prop. & Cas. Ins. Co.*, --- N.W.2d ---, 2009 WL 234270, at *4 (Minn. Ct. App. Jan 26, 2009). The threshold question is whether "some damage" occurred during the policy period. *Northern States Power*, 523 N.W.2d at 662. The injury occurs "not [at] the time the wrongful act was committed but [at] the time the complaining party was actually damaged." *In re Silicone Implant Ins. Coverage*, 667 N.W.2d 405, 415 (Minn. 2003).

The amount of property damage during the policy period does not need to be extensive—a very minute amount or the beginning of a process that causes injury over time is sufficient. *See Parr v. Gonzalez*, 669 N.W.2d 401, 406 (Minn. Ct. App. 2003); *In re Silicone*, 667 N.W.2d at 414. For example, in *In re Silicone*, cellular-level injuries that started when silicone began leaking from a breast implant were sufficient to trigger coverage (*In re Silicone*, 667 N.W.2d at 414), and in *Parr v. Gonzalez*, damage just to a furnace vent cap was sufficient to trigger a policy, even though the resulting mold growth might not have occurred until after the policy period (*Parr*, 669 N.W.2d at 406). In fact, a policy will be triggered even if an injury is not "diagnosable, compensable or manifest during the policy period as long as it can be determined, even retroactively, that some injury did occur during the policy period." *Westfield Ins. Co. v. Kroiss*, 694 N.W.2d 102, 106 (Minn. Ct. App. 2005); *Tony Eiden Co. v. State Auto Property and Cas. Ins. Co.*, No. A07-2222, 2009 WL 233883, at *2 (Minn. Ct. App. Jan. 26, 2009).

Whether property damage actually occurred triggering coverage during a policy period is a question of fact to be determined at trial. *Kroiss*, 694 N.W.2d 102, 106-07; *Donnelly Bros.*, --- N.W.2d ---, 2009 WL 234270, at *4. To avoid summary judgment on this issue, an insured need not *prove* any harm occurred during the policy period; instead, the insured merely needs to "present evidence that a genuine issue of material fact exists as to whether actual harm occurred during the policy periods." *Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 535 N.W.2d 337, 341 (Minn. 1995).

### 2. The evidence demonstrates that property damage occurred during UNIC's policy period.

In this case, Davis-Frost and Gunderson have submitted uncontradicted evidence that property damage occurred during UNIC's policy periods, triggering the coverage under the policies. The railcars were painted and put into service during UNIC's policy periods—they were shipped to the customers between August 2000 and February 2001. (Seidl Aff. ¶ 11, Ex. B.) The railcars would have been exposed to the high temperatures and moisture that caused the blistering of the paint and, subsequently, the rusting of the cars, shortly after being put into service. According to Davis-Frost's expert, the blistering of the paint would have begun as soon as the cars reached temperatures of 120° Fahrenheit, a temperature easily obtainable for a metal car on a summer day, and that the rusting would have begun immediately upon exposure of the ruptured blisters to moisture. (Beasley Aff., Ex. 2, Race Letter Report.)

Various expert testimony and other evidence demonstrate that the blistering and rust would have started between July 2000 and July 2002, the time UNIC's coverage was

in force.  First, Timothy Race, Davis-Frost's expert, opined that, at the latest, the paint blistering would have begun by the end of July 2001—before the end of UNIC's first policy period—and the rusting would have started "**at the latest**" by the end of August 2001—at the beginning of UNIC's second policy period.  (Id.)  Gunderson's expert, James Burke,  opined that the railcars would have showed blistering and cracking at eight weeks—which is well within UNIC's first policy period, even for the latest painted cars, which were finished in February 2001.  (Burke Aff. ¶ 10.)  Burke has also opined that the rusting process would have begun immediately upon the exposure of the cracked and blistered areas to water and oxygen.  (Id.)  An internal test by Davis-Frost showed blistering within *two weeks* of application.  (Seidl Aff. ¶ 13; Ex. E.)  In addition, a BNSF employee testified in the Underlying Action that BNSF cars that were painted at the same time as the TTX cars were exhibiting blistering by the latter part of 2001, well within UNIC's second policy.  (Seidl Aff. ¶ 12, Ex. D, Gideon Depo. at p. 25: 9-24.)  The pictures of the damaged railcars provided by Gunderson demonstrate clearly that the paint blistering was pervasive and widespread, and where the paint blistered, the car itself rusted.  (Seidl ¶ 14, Ex. F.)  All this evidence establishes that property damage began to the railcars during UNIC's policy periods.[6]

---

[6] When multiple insurance policies are triggered by an injury that can be traced to "some discrete and identifiable event," the court will allocate all of the damages from the injury to the insurance policy on the risk at the time of the event, even if the injury continues during successive policy periods.  *In re Silicone*, 667 N.W.2d at 421-22; *Tony Eiden*, 2009 WL 233833, at *3.  In this instance, the damages to all of the railcars arose from the "discrete and identifiable event" of painting them with Davis-Frost's paint.  Under these authorities, because United National's insurance policies were in effect when the cars were painted, and the onset of corrosion started shortly thereafter, all of the damages

Davis-Frost has presented sufficient evidence for the Court to rule as a matter of law that property damage occurred during UNIC's policy periods, or at a minimum to raise a genuine issue of material fact regarding whether property damage occurred during UNIC's policy periods. Therefore, summary judgment should be denied on this issue.

### B. Defendants Are Not Collaterally Estopped From Presenting Evidence of the Onset of Property Damage or other Coverage-Related Facts.

UNIC argues that there is no fact issue regarding whether property damage occurred during its policy period because there was no finding in the Underlying Action regarding when the damage to the railcars began. As a preliminary point, not one of UNIC's cited cases actually supports its proposed "general rule" that new evidence cannot be submitted in a case disputing insurance coverage for an underlying action. (UNIC's Mem. at 11-13.) UNIC seems to be suggesting since the issue was not decided in the Underlying Action, Davis-Frost and Gunderson are collaterally estopped from litigating it here. This argument demonstrates a profound misunderstanding of the concept of collateral estoppel. Collateral estoppel "precludes parties from relitigating issues which are identical to issues previously litigated and which were necessary and essential to the former resulting judgment." *Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn. 1990); *see Mandich v. Watters*, 970 F.2d 462, 465 (8th Cir. 1992).

In an action disputing insurance coverage of an underlying action, if key issues regarding coverage were not determined in the underlying action, they may be resolved

from the Underlying Action should be allocated to the UNIC Policies.

by the court in the later action, as demonstrated by the very cases cited by UNIC. *Brown v. State Auto & Cas. Underwriters*, 293 N.W.2d 822, 825 (Minn. 1980) (holding insurer was entitled to litigate the issue of the insured's intent, which was not a necessary or essential issue in the underlying action determining insured's liability to victim); *Parr*, 669 N.W.2d at 405-06 (allowing insurer to present two coverage defenses that had not been considered in the underlying default action); *In re Silicone,* 652 N.W.2d at 257 (stating question of when injury first occurred was not decided in the litigation between insured and the underlying plaintiffs). This is consistent with the principles of collateral estoppel, which only prevent relitigation of issues that were already decided in a prior action.

In this case, the question of whether damage occurred in UNIC's policy periods was not an element of any of the cases of action in the Underlying Action, and was not decided by the jury. (Seidl Aff. ¶ 6; Beasley Aff. ¶ 6.) The verdict form demonstrates that the issues considered by the jury were the following: (1) whether the defendant breached a contract; (2) whether the defendant breached a warranty; (3) whether the defendant engaged in fraudulent concealment; and (4) the amount of the plaintiff's damages. (Simon Aff., Ex. 3, Jury Verdict Form.) This situation in the present case is identical to *In re Silicone*, in which the court noted that the issue of when the injury first occurred—and therefore the issue of whether the insurer's policy was triggered—was not decided in the underlying action for damages between the insured and plaintiffs who had been harmed by its product. *In re Silicone*, 652 N.W.2d at 257.

Because the issue of whether damage occurred in UNIC's policy period was not decided in the underlying action, defendants cannot be collaterally estopped from introducing evidence and litigating the trigger of coverage issue.

## III. DAVIS-FROST'S POLICIES PROVIDE COVERAGE FOR BREACH OF CONTRACT AND BREACH OF WARRANTY CLAIMS IF THEY ARE BASED ON PROPERTY DAMAGE CAUSED BY AN OCCURRENCE.

UNIC argues that CGL policies can never cover damages sought through breach of contract or breach of warranty claims. However, the manner in which a cause of action is pleaded does not dictate whether coverage exists for any resulting liability; instead, the Court must examine the policy language and apply it to the facts of the claim. In this case, the UNIC policies expressly provide coverage for property damage liability imposed against Davis-Frost in the Underlying Action, and the fact that this liability was imposed for breach of contract and breach of warranty is of no consequence to coverage.

### A. Insurance Coverage Depends on the Application of the Insurance Policy to the Facts of the Case, Not on the Form of Action Chosen by the Plaintiff.

Minnesota courts recognize that the language of the policy controls insurance coverage, as opposed to an arbitrary distinction between tort and contract actions, often called the "business risk doctrine." The general thrust of the business risk doctrine is that CGL policies do not provide coverage for breach of contract actions demanding the cost of correcting the insured's defective work or product. These are said to be ordinary risks of business, as opposed to unanticipated damages to third party property caused by a defect in the insured's work or product, which are covered. *See Bor-Son Bldg. Corp. v. Employers Commercial Union Ins. Co.*, 323 N.W.2d 58, 63 (Minn. 1982). In several

more recent cases, the Minnesota Supreme Court explicitly rejected the idea that a judicially-created business risk doctrine, not expressed in the insurance policy itself, should be applied when a court interprets a policy. *Wanzek Construction, Inc. v. Employers Insurance*, 679 N.W.2d 322, 327 (Minn. 2004) (explaining that *Bor-Son* interpreted an earlier version of the CGL form; holding that the suggestion that the business risk doctrine should drive the interpretation of the CGL policy was "incorrect"); *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 880, 882 (Minn. 2002) (explaining that coverage is determined by the language of the policy, not by the business risk doctrine). Instead, the extent that the policy covers the "business risk" of the insured depends upon the specific terms of the contract. *Wanzek*, 679 N.W.2d at 327; *Thommes*, 641 N.W.2d at 882; *Web Construction, Inc. v. Cincinnati Ins. Co.*, No. 06-5061, 2007 WL 4230751, at *6 (D. Minn. 2007).

In *Florists' Mutual*, the court followed the approach of *Wanzek Construction* and *Thommes* and analyzed whether the insured's claim was covered based on the language of the policy—even though the claims against the insured were for breach of contract and breach of the covenant of good faith and fair dealing. *Florists' Mutual*, 535 F.Supp.2d at 949, 952 n.3. The court ultimately determined that the "your product" exclusion precluded coverage for the claim because no third-party property damage had occurred. *Id.* at 951-52. The court did not base its ruling on the decision by the plaintiff to plead its claims as "breach of contract" rather than "negligence." *Id.*

**B.     Minnesota's Approach Is Consistent with Authority from Other Jurisdictions.**

Recently, courts in other jurisdictions, including several State Supreme Courts, have also found that insurance coverage should hinge on the nature of the damage and the language of the insurance policy, not whether a particular action is pleaded as a tort or contract claim. *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 884-85 (Fla. 2007); *Lamar Homes, Inc. v. Mid-Continent Casualty Co.*, 242 S.W.3d 1, 8-10 (Tex. 2007); *Acuity v. Burd & Smith Construction*, 721 N.W.2d 33, 38 (N.D. 2006); *American Family Mutual Insurance Co. v. American Girl, Inc.*, 673 N.W.2d 65, 77 (Wis. 2004); *Vandenberg v. Superior Court*, 982 P.2d 229, 244 (Cal. 1999); *Hotel des Artistes, Inc. v. Gen. Accident Ins. Co. of Am.*, 775 N.Y.S.2d 262, 268 (N.Y. App. Div. 2004); *see also* 2 Allan D. Windt, Insurance Claims and Disputes § 11:7 (5th ed. 2008) (if an injury is caused by an accident, the requisite occurrence is not absent simply because the claim is for breach of contract); 9 Couch on Ins. § 126:3 (3d ed. 2008) (the form of the legal proceeding does not affect the coverage afforded by a liability policy). According to these courts, as long as the requisite occurrence and property damage are present, a CGL policy provides coverage for tort, contract or statutory claims. *Acuity*, 721 N.W.2d at 38. Insurance policies are simply contracts, these courts reason, and their terms should be enforced as written without the imposition of arbitrary distinctions between types of claims. *Vandenberg*, 982 P.2d at 244. If an insurer wanted to limit its liability to tort claims only, it could do so in the policy, but the current standard CGL form does not do so. *American Girl*, 673 N.W.2d at 76-77, n.6.

The Eighth Circuit recently had occasion to address coverage in a breach of warranty case involving tomato plants that were stunted, sunburned, waterlogged, and cracked because of the failure of a protective film sold by the insured. *Ferrell v. West Bend Mut. Ins. Co.*, 393 F.3d 786, 789, 795 (8th Cir. 2005) (applying Wisconsin law). Despite the insurer's argument that coverage did not exist for "contractual" liabilities, the Court determined that an "occurrence" of property damage had occurred in the case, making the insurer liable for the damages. *Id.* at 795. The court noted that in Wisconsin (as under Minnesota law) the language of the policy determines the scope of the coverage. *Id.*

As in these other jurisdictions, under Minnesota law the liability imposed against Davis-Frost for claims for damage to the railcars does not fall outside the scope of coverage simply because the claims were brought as breach of contract and breach of warranty claims.

### C. UNIC's Cited Cases Are Inapposite Because They Do Not Involve Damage to Third-Party Property Resulting from an Occurrence.

UNIC cites a long list of decisions for the proposition that contractual claims are never covered by CGL policies. However, these cases are inapposite because none of them involved claims for damage to third-party property arising from an occurrence. *See Reinsurance Association of Minnesota v. Timmer,* 641 N.W.2d 302, 312 (Minn. Ct. App. 2002) ("Typically, insurance policies do not provide coverage for contractual liabilities, essentially ***because those liabilities are not based on an "accident" arising from an "'occurrence.'"***) (emphasis added). For example, in *Integrity Mutual Insurance Co. v.*

*Klampe*, the court excluded coverage for most of the damages claimed by homeowners against the insured, a contractor, because the damages were the cost of correcting the insured's faulty work itself—not for repairing damage to third-party property. No. A08-0443, 2008 WL 5335690, at *4 (Minn. Ct. App. Dec. 23, 2008). However, water damage caused by a pipe that burst after the contractor left it exposed qualified as an "occurrence" because the bursting pipe was an accident that led to property damage beyond the mere cost of repairing the insured's faulty workmanship. *Id.* at *5 (ultimately denying coverage based on an exclusion).

Similarly, in *Western Nat'l Mutual Ins. Co. v. Barbes*, claims for the cost of the repair of the insured's faulty work were not covered; however, the insurance company itself admitted there would be coverage for ***damage to other property*** caused by insured's faulty work. No. A05-2011, 2006 WL 1704201, at *1, 4 (Minn. Ct. App. June 20, 2006), . The remaining cases cited by UNIC are inapplicable for the same reason. *See, e.g.*, *Franklin v. Western National Mut. Ins. Co.*, 574 N.W.2d 405, 407 (Minn. 1998) (no insurance coverage for a trespass claim against an insured who breached a lease, which allowed it to erect and maintain an outdoor advertising sign, by refusing to remove the sign upon notice to vacate).

   **D.   Davis-Frost Neither Expected Nor Intended the Damage to the Railcars.**

In Davis-Frost's policies, UNIC agrees to cover "property damage" caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Anderson Aff., Ex. A,

UNIC Policy Excerpt, at Section V, ¶ 12.)  Under Minnesota law, an accident is an

"unexpected, unforeseen or undesigned happening or consequence from either a known

or unknown cause." *Hauenstein v. Saint Paul-Mercury Indem. Co.,* 65 N.W.2d 122, 126

(Minn. 1954).  The damage arises from an "accident" if the insured had no intent to

injure, even if the conduct that causes the injury is itself intentional. *American Family v.*

*Walser*, 628 N.W.2d 605, 612 (Minn. 2001)[7]; *Web Construction,* 2007 WL 4230751, at

*7 (holding defects in concrete floor installed by insured constituted an accident because

no evidence showed that the insured intentionally caused the defects); *Western National,*

1998 WL 27247, at *1 (holding "there is an 'occurrence' as long as the insured did not

engage in conscious wrongdoing")[8]; *Klampe*, 2008 WL 5335690, at *4 (explaining that a

"contractor who ***knowingly*** violates contract specifications is consciously controlling his

risk of loss and has not suffered an occurrence") (emphasis added).

UNIC argues that the failure of the paint and the damage to the cars was not an

occurrence.  However, UNIC has presented no evidence that when Davis-Frost sold the

paint to Gunderson, Davis-Frost ***expected or intended*** the paint to fail.  Even after Davis-

---

[7] UNIC's argument that *Walser* only applies to the intentional act exclusion and not the definition of "accident" is extraordinary considering that the very section UNIC cites states, "[W]here there is specific intent to cause injury, conduct is intentional for purposes of an intentional act exclusion ***and not accidental for purposes of a coverage provision***." *Walser*, 628 N.W.2d at 612 (emphasis added).

[8] Again, UNIC's attempts to distinguish this case are without merit.  The cases cited by the court in *Western National* are still good law:  *Bituminous Casualty Corp. v. Bartlett,* 240 N.W.2d 310 (Minn. 1976) was overruled, but on other grounds; and *Ohio Casualty Insurance Co. v. Terrace Enterprises*, 260 N.W.2d 450 (Minn. 1977) has not been "called into doubt" on the point cited by the court in *Western National*, as is clear from UNIC's own brief.  (UNIC's Mem. at 35.)

Frost learned of the problems, its investigations led it to conclude the paint problems were caused by faulty application. (Henning Testimony, at 756:15-19.)

Nor does the fact that a jury found Davis-Frost had breached its contract with Gunderson provide evidence of Davis-Frost's intent. There was no contention in the Underlying Action that Davis-Frost intentionally violated its contract with Gunderson. *Compare Klampe*, 2008 WL 5335690, at *4. A party may breach a contract unintentionally; intent is not an element of a contract claim. At a minimum, a genuine issue of material fact exists on this issue, precluding summary judgment.

UNIC also argues that claims for breach of warranty are specifically excluded under the "your product" exclusion in the policy. The definition of "your product" states that it "includes [w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product,'" but this simply means that coverage is excluded for damage to the product itself, which might also qualify as a breach of warranty. (Anderson Aff., Ex. A, UNIC Policy Excerpt, Section V ¶ 18.) The exclusion does not preclude coverage for damages for a breach of warranty claim that involves damage to third-party property caused by an accident, and UNIC has cited no cases applying this exception in such a manner.

In this case, because the property damage to third-party railcars was allegedly caused by Davis-Frost's paint through an "occurrence," the claims are within the scope of UNIC's policies, even though they were styled as breach of contract and breach of warranty. UNIC has not shown it is entitled to judgment as a matter of law on this point, and the summary judgment motion accordingly should be denied.

## IV. UNIC'S MOTION IS PREMATURE AND DAVIS-FROST IS ENTITLED TO RELIEF UNDER RULE 56(f).

Under Federal Rule of Civil Procedure 56(f), if a party opposing a motion for summary judgment "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," the court has the discretion to deny the motion, order a continuance to allow discovery, or issue any other just order. Fed. R. Civ. P. 56(f). This rule allows the Court to postpone ruling on UNIC's summary judgment motion if it finds Davis-Frost "needs additional discovery to explore 'facts essential to justify the party's opposition.'" *See Crawford-El v. Britton*, 523 U.S. 574, 599 n.20 (1998). To obtain a postponement, Davis-Frost must file an affidavit "demonstrating specifically why a response is not possible, what relevant facts discovery might provide, and how further discovery will allow a response." *Boone v. PCL Const. Servs., Inc.*, No. 05-24, 2005 WL 1843354, at *4 (D. Minn. Aug. 2, 2005).

Discovery in this action has barely begun. The parties' initial disclosures were due only last month, and the deadline for fact discovery is not until July 1, 2009. (Pretrial Scheduling Order, Dec. 10, 2008.) None of the parties has served interrogatories, requests for production, or notices of deposition. (Anderson Aff. ¶ 2.) Much information is available in the record of the Underlying Action; however, discovery was not made on many issues that bear on the present dispute. Specifically, discovery on the time that the blistering, rusting and corrosion, and decal damage began to occur would allow Davis-Frost to better demonstrate the existence of genuine issues of material fact in this case. (Id. ¶ 3.)

# CONCLUSION

For the foregoing reasons, Davis-Frost respectfully requests that the Court deny

UNIC's Motion for Summary Judgment.  Alternatively, the Court should postpone

consideration of the summary judgment motion under Rule 56(f) to allow the parties to

complete discovery.


Dated:  February 24, 2009    **GRAY, PLANT, MOOTY, MOOTY &**
**BENNETT, P.A.**

 s/Rick E. Kubler
Rick E. Kubler (#0190007)
Joy R. Anderson ((#0388217)
500 IDS Center
80 South 8th Street
Minneapolis, MN   55402
Telephone:  (612) 632-3224
Fax:  (612) 632-4424

**ATTORNEYS FOR DEFENDANT DAVIS-**
**FROST, INC.**

GP:2525744 v1